FILED

MAY 1 1 2009

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| PETER POULOS,<br><br>        Plaintiff,<br><br>vs.<br><br>SUMMIT HOTEL PROPERTIES, LLC,<br>SUMMIT GROUP, INC.,<br>KERRY W. BOEKELHEIDE, and<br>TRENT PETERSON,<br><br>        Defendants. | CIV. #09-*4062*<br><br><br>**COMPLAINT AND DEMAND<br>FOR TRIAL BY JURY** |

Plaintiff Peter Poulos ("Poulos") brings this action against Defendants and shows the Court as follows:

## OVERVIEW

1.   Defendants Summit Hotel Properties, LLC and Summit Group, Inc. (collectively "Summit") are based in Sioux Falls, South Dakota and develop, own and manage over 60 hotels nationwide.

2.   Until November 2008, Poulos managed one of Summit's hotels where he learned of and reported criminal fraud and theft by a Summit Regional Manager involving her stealing over $20,000 of an overpayment from one corporate customer to pay uncollectible overdue account receivables attributable to other customers.   While engaging in her criminal fraud and theft, that Regional Manager was complying with a directive from a Summit Director.   Poulos requested that Summit conduct an audit.   There is substantial evidence that Summit's fraud on its customers and shareholders goes beyond this incident and that fraud has been ratified and overseen at the highest levels of Summit in South Dakota.

3.  Plaintiff's report of significant fraud and his request for a larger audit to uncover additional financial wrongdoing caused Summit great concern.  Indeed, as reported in public SEC filings, because of massive debt it had incurred, Summit was on the verge of seeking equity funding of up to $200 million from current and prospective investor/shareholders.  These investor/shareholders did not know about the fraud uncovered and reported by Poulos but would learn of it by virtue of Poulos' report and the audit he demanded.

4.  While Poulos was a stellar performer, because of his whistle blowing (and in direct violation of its own written and legally required policies) Defendants conspired in South Dakota to terminate Poulos' employment.  Defendants terminated Poulos from South Dakota to execute that conspiracy.  At the same time Defendants terminated Poulos, Summit retained the persons directly responsible for the fraud and left these individuals in a position where they continued to have access to customer and corporate assets.

5.  Even more, in response to Poulos' subsequent conflict resolution complaint, the very highest levels of Summit conspired in South Dakota to engage in further fraud and now effectively admitted gross fraud by knowingly making repeated false material representations about the fraud reported by Poulos.

6.  Once again, Summit engaged in such additional fraud at the same time when it was about to seek up to $200 million in new investment.  Legal claims by Poulos would have exposed Summit's customer and shareholder fraud.  Accordingly, to seek to prevent such legal claims, Defendants fraudulently misrepresented the evidence against it, thereby compounding its wrongdoing.

7. Based on Defendants' illegal and tortious actions, Plaintiff files this suit seeking relief and damages in excess of $10 million from Defendants arising out of their joint wrongdoing described herein.

## JURISDICTION AND VENUE

8. This is a civil action over which, diversity jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1332(a).

9. Plaintiff is a citizen of the State Of Georgia.

10. Defendants are each citizens of the State of South Dakota.

11. The amount in controversy in this action exceeds the sum and value of $75,000, exclusive of interest and costs.

12. As each and all of the Defendants reside in the State of South Dakota, venue is appropriate in this Court under 28 U.S.C. § 1391(a).

## THE PARTIES

13. Defendant Summit Hotel Properties LLC is a corporation incorporated in South Dakota with its principal place of business located at 2701 S. Minnesota Ave., Suite 6, Sioux Falls, South Dakota 57105. Its registered agent for service of process is John F. Archer, 600 South Main, Suite 102, Sioux Falls, South Dakota 57104.

14. Defendant Summit Group, Inc. is a corporation incorporated in South Dakota with its principal place of business located at 2701 S. Minnesota Ave., Suite 6, Sioux Falls, South Dakota 57105. Its registered agent for service of process is Kerry W. Boekelheide at 2701 S. Minnesota Ave., Suite 6, Sioux Falls, South Dakota 57105.

15.    Defendant Summit Group, Inc. is the Manager of Defendant Summit Hotel Properties LLC and jointly employed Poulos.  These two alter ego Defendants are hereinafter referred to collectively as "Summit."

16.    Defendant Kerry W. Boekelheide ("Boekelheide") is the Chief Executive Officer and partial owner of Summit.  He also owns other businesses based in South Dakota.  He is a resident of the State of South Dakota.

17.  Defendant Trent Peterson ("Peterson") is a Director of Summit.  He is a resident of the State of South Dakota.

18.  Until November 2008, Plaintiff Peter Poulos ("Poulos") was the General Manager of a Summit-owned Hotel in Atlanta, Georgia called the "Hyatt Place" ("Hyatt Place").

## FACTUAL ALLEGATIONS

19.  In March 2007, Summit hired Poulos as the Director of Sales at Hyatt Place. Because of his stellar performance, in 2008, Summit promoted him to General Manager of Hyatt Place.

20.  As a result of his promotion to General Manager in February 2008, Summit required Poulos to enter into a written contract with it relating to his Summit employment ("Contract").

21.  The Contract states that it is between Poulos, Summit Group, Inc, and Summit Hotel Properties (which are collectively thereafter referred to in the Contract as "Partnership").

22.  The Contract states that Poulos "was hired by Partnership as a *general manager. . .*" (emphasis in original).  The Contract states that Poulos is employed by Summit as "an employee at will."

4

23.   The Contract states that it "shall be construed, interpreted, and enforced in accordance with, and governed by, the laws of the State of South Dakota, exclusive of the choice-of-law rules thereunder."

24.  In 2008, after promoting him to General Manager, Summit highly rated Poulos as a General Manager.  It rated him as "exceeds company standards" in 41 separate categories of assessment.  Poulos was also told in writing that he was doing a "great job."

25.   As General Manager in 2008, Poulos reported to Summit Regional Manager Stephanie Romic ("Romic").   Romic reported to Defendant Peterson whose office was at Summit's headquarters in Sioux Falls, South Dakota.

26.  By 2008, Summit – like many businesses in the hospitality and travel industry – was suffering hard economic times.  Among other problems, certain corporate customers were not paying overdue bills, and Summit's aged accounts receivables was growing.

27.  Moreover, due to significant debt and a bad hotel economy, Summit was preparing in 2008 for a massive offering of shares seeking to procure new shareholder investment to service its debt and to allow for necessary expansion of its business.

28.  Summit launched this 2008 plan in late 2008 and early 2009 when it filed 8-K reports with the SEC announcing its intent to offer shares to raise up to $200 million.  Any cloud of fraud or impropriety at Summit of course could risk the results of this offering and thus possibly threaten the continued viability of Summit.

29.  Also in 2008, Peterson and Romic realized that they had to do something about the reported revenue at the hotels in Romic's region.  Again, one of the problems was aged account receivables.

5

30. One approach directed by Peterson to Romic was to "clean up" the aged account receivables of corporate customers of the hotel. Romic was aware that most of these aged account receivables at Hyatt Place pre-dated Poulos' tenure as General Manager and were uncollectible (due to mis-billing, lack of sufficient underlying financial records, or due to prior satisfaction of the account). Romic sent and received emails addressing some of these specific aged account receivable problems.

31. In this timeframe, Romic learned that one of Summit's corporate customers at Hyatt Place had unknowingly over paid Summit a bill for a specific stay at the hotel. The overpayment was in an amount of over $60,000. The customer overpaid this amount by submitting a second payment for a bill that it did not realize had already been paid by a third party.

32. Romic told Poulos that she would arrive at Hyatt Place on September 9, 2008 and that she would then have Poulos use monies from the overpayment to pay other overdue account receivables due Summit by that overpaying customer.

33. But, on September 9, 2008, Romic instead committed theft and fraud. First, Poulos and another Summit employee specifically identified in writing the only 15 accounts – by account name and number - for which the overpaying customer was responsible. Romic fully understood the identity of those 15 accounts. The amount due by the overpaying customer on those accounts was approximately $30,000.

34. Second, Romic identified other aged account receivables not affiliated with the overpaying customer that Peterson had asked her to "clean up." Romic was told that those aged accounts were likely uncollectible. Indeed, Romic had previously communicated by email about some of these aged accounts establishing that she fully realized that they had nothing to do with the overpaying customer and fully realized that they would be impossible or virtually impossible

6

to collect. Romic realized that she was not able to lawfully clean up these account receivables as directed by Peterson.

35. Third, Romic directed Poulos to sit at the computer and, using Summit's accounting system (that is centralized in South Dakota), pay or "post" monies owned by the unknowing overpaying customer to pay certain bills of overdue accounts that had nothing to do with the overpaying customer.

36. The process directed by Romic caused Poulos concern for a number of reasons. For example, Romic would not give him the account name – but only the account number – of the accounts he was paying with the money of the overpaying customer. In addition, Romic had him take and spend all of the approximately $60,000 check on more than 15 accounts when he and Romic knew that only about half that amount was owed by the overpaying customer in 15 earlier identified accounts attributable to that overpaying customer. Moreover, Romic made a statement – "this is a mighty big bus" – that Poulos ultimately recognized from previous statements by Romic constituted an acknowledgment that she was knowingly doing something wrong for which someone (i.e., Poulos) could "throw her under the bus."

37. Over the following two days, Poulos confirmed to himself that Romic had knowingly engaged in conduct that amounted to criminal theft and fraud. And he knew this fraud took place in the center of the company in South Dakota. Indeed, Summit markets to investors with the public statement that it saves money by centralizing the accounting for all of its hotels in South Dakota.

38. Poulos reviewed the account receivable report after September 9 and saw the several aged account receivables that were now shown as paid had nothing to do with the obligations of

7

the overpaying customer.  He saw that Romic had boldly stolen the overpaying customer's money to pay the overdue and uncollected bills of the overpaying customer's <u>corporate rivals</u>.

39.  Poulos also talked to a friend with experience in the field who confirmed that Romic had engaged in felonious conduct on behalf of Summit.  Poulos then considered what he should do about his knowledge of Romic's criminal conduct.

40.  Summit had and has a written "Code of Business Conduct And Policy" ("Code").  Summit's Code is designed to stave off SEC scrutiny and possible criminal sanctions in the event of a finding of fraud and to convince shareholders and potential shareholders that their current and potential investment is insured by a strict and enforceable policy to (a) encourage reports of unethical conduct and (b) legally prevent retaliation for such reports.

41.  While Summit's Contract with Poulos and Summit's Employee Handbook ("Handbook") include a general statement that Poulos was employed at-will and thus could generally be terminated for any reason, the Code set forth in the Handbook includes a legal exception to that general employment at-will rule.

42.  The Code tells employees that they have a <u>duty</u> to report unethical conduct at Summit.  It states that those who have engaged in such unethical conduct "will" be subject to disciplinary action.

43.  Importantly, the Code makes it clear that there is a very important exception to the general statement that Summit can terminate its employees at will – "<u>You may report ethical violations in confidence and without fear of retaliation.</u>"  (Emphasis in original).  Lest there be any doubt that Summit contractually guaranteed that it could not retaliate against employees for reporting ethical conduct, the Code states further, "The Employer does not permit retaliation of any kind against employees for good faith reports of ethical violations."   Once again, Summit

states, "The employee <u>will not</u> be disciplined for raising a concern in good faith." (emphasis added).

44. Thus, Summit acts as a fiduciary of any employee who reports conduct in good faith under the Code of Conduct and legally binds itself to act in the interest of any such employee fiduciary to ensure that he or she is not adversely impacted because they reported that conduct.

45. Supported by these legal guarantees and promises, on September 12, 2008, Poulos reported Romic's criminal fraud and theft to Summit's COO Craig Aniszewski ("Aniszewski"). Summit documents report that, among other statements, Poulos used the very adjective called for by the Code to make such protected report – i.e., Summit admits that he reported that Romic had engaged in "unethical" conduct.

46. In the following days, pursuant to a Summit Human Resources' directive, Poulos also submitted a written report to Summit in South Dakota addressing certain relevant events on September 9. In addition, based upon his reasonable belief in more widespread false and fraudulent accounting, he requested in writing that Summit conduct a full audit of its accounting records at Hyatt Place.

47. Very quickly, Summit realized that Romic had indeed engaged in criminal fraud and theft. Indeed, she effectively admitted as much to Summit.

48. Poulos reported conduct by Romic that violated South Dakota criminal and civil law.

49. Defendants recognized that Romic committed these crimes on behalf of Summit. But Defendants protected Romic and retaliated against Poulos for making his report.

50. First, Peterson – who had directed Summit's plan to "clean up" the overdue accounts – called Poulos from South Dakota to chastise him for reporting Romic to Aniszewski. He told Poulos he was wrong to report Romic to Aniszewski. Peterson directed Poulos to only talk to

him about any further fraud.  Peterson was himself complicit in the corruption, and he wanted to cover up any further fraud exposed by Poulos.

51.  Peterson also tasked Regional Manager Janis Moeller ("Moeller") to cover up Romic's fraud.  Moeller did so, including by sending a knowingly false letter to the overpaying customer about the overpayment designed to lull the customer into believing that its overpayment had at all times been handled lawfully and correctly.

52.  Defendants decided that they would take no material action against Romic – even though they knew they were continuing to employ a thief of customer assets at a high level where she continued to have access to customer and shareholder assets.  Summit concluded that Romic was doing what the Company wanted her to do and increase reported revenue even with theft and fraud.  As a cover up maneuver, Summit issued a vague letter to Romic simply stating she should have coordinated the process she followed.

53.  In contrast, Summit concluded that Poulos was doing what they did not want a manager to do – expose corporate fraud and seek further investigation that could expose the fraud to customers and shareholders.

54.  Accordingly, Defendants conspired to unlawfully terminate Poulos for his legally protected conduct.  Romic and Moeller, who was a close friend of Romic's, conspired to knowingly and wrongfully make false statements to Summit about Poulos for Summit to use to fire Poulos.

55.  Romic and Moeller made statements seeking to cast Poulos as a poor General Manager of the hotel when they knew those statements were false.

56.  Indeed, in October 2008, Hyatt conducted an independent audit of Hyatt Place and issued its conclusions and rating scores in a report.  Hyatt recorded that Poulos' hotel had earned

a "good score." On October 24, Hyatt's representative sent Poulos an email (copied to Peterson and Moeller) congratulating him and stating that he should be "very proud" of his hotel's scores and to keep up the good work. A Hyatt Regional Vice President echoed Hyatt's high praise of Poulos' performance as General Manager stating "keep up the good work in Atlanta."

57. Nevertheless, on November 4, only seven business days after receiving such written praise for his overall performance by Hyatt and by Summit, Moeller (who had just met Poulos) issued Poulos a disciplinary letter remarkably stating, amongst other obvious pretext, that Poulos' stellar hotel performance on the Hyatt audit was "unacceptable" and even amounted to a "violation."

58. Even more, Moeller incredibly stated that Poulos had engaged in "insubordination" because he took several seconds to answer one of her questions, even though he answered it correctly and without any word that could even remotely be deemed to be insubordinate. Moeller issued this letter to Poulos on her way out of the Hotel to fly home such that she would not have to discuss it with him. The pretext and wrongdoing could not have been more transparent.

59. On November 12, Poulos reported to Summit HR Director Lori Richards ("Richards") in South Dakota that Moeller had improperly issued him the disciplinary letter. Richards did not deny it but made it clear she would take no action and suggested Poulos call Peterson. Poulos questioned that advice for obvious reasons, but Richards abandoned her HR and legal responsibilities and simply told Poulos that it was up to him whether to call Peterson.

60. Accordingly, on November 12, Poulos called Peterson in South Dakota and told him that Moeller was engaging in retaliation against him because of his report on Ms. Romic. Peterson reacted with immediate anger. Within seconds of Poulos' renewed whistle blowing,

Peterson told Poulos that he would now not continue in his position and that he could resign in lieu of termination. As Summit's written policy requires that resignations be in writing, Peterson told Poulos that he must obtain a written resignation from Poulos by the end of that day. With these actions, Peterson further revealed that he was complicit in Romic's criminal actions and that her crimes and corruption were sanctioned from the top executives in South Dakota.

61. Poulos did not submit a written resignation either that day or on any other day. To the contrary, on November 13, he sent Peterson an email stating definitively that he would not resign.

62. Later on November 13, Peterson issued from South Dakota a letter to Poulos amazingly stating that he had accepted a fictional resignation from Poulos and that his last paid day at Summit would be November 26, 2008. Even Peterson's last letter was a fraud. Summit terminated Poulos from South Dakota.

63. In order to lure investors and keep the SEC at bay, Summit has a written Conflict Resolution Process ("CRP") to give the appearance that it is serious about ensuring the integrity of its employment decisions that bear on claims of unethical conduct.

64. Under the CRP, if a complaining party submits a complaint in writing to Summit's headquarters in Sioux Falls, South Dakota, Summit is bound to investigate the complaint.

65. Under the CRP, Summit is required to analyze the relevant facts in the complaint "by talking with the appropriate parties and reviewing the findings." Summit then promises, "A final decision regarding the matter will then be issued."

66. On November 17, Poulos submitted (through his legal representative) his written complaint in separate copies to Summit and its leaders in South Dakota, including directly to Boekelheide and Peterson.

67. If it followed its stated procedure, Summit then interviewed and obtained evidence from all the "appropriate parties," including Boekelheide, Aniszewski, Peterson, Richards, Romic, and Moeller.

68. Summit obviously recognized that Romic had committed criminal fraud and that it had terminated Poulos because he exposed that fraud and requested a further audit that would expose even more widespread fraud. However, Summit had no interest in correcting those illegal acts.

69. Summit concluded that admitting its wrongdoing would not only expose further fraud but would expose it to its corporate customers and shareholders around the country. Once again, Summit was about to seek up to $200 million in an offering to potential investors.

70. Accordingly, Defendants conspired to commit still another fraud. Defendants made an assumption that Poulos did not have any Summit documents relating to the Romic fraud and his report of it. Accordingly, it decided to concoct a wholly fictional set of facts and communicate it back to Poulos. In this manner, Defendants aimed to prevent any litigation by seeking to deceive Poulos and his counsel that his allegations would be disproven by the evidence.

71. In letters through a retained counsel (who apparently was himself a victim of Defendants' fraud) dated November 26 and December 9, Summit issued its CRP "final decision" ("CRP Final Decision").

72. Summit's conclusion in its CRP Final Decision was that Poulos' allegation that Romic had committed wrongdoing was false. It stated that the conduct of Romic and the other employees in question "were appropriate and legal." Summit stated that Poulos had in fact resigned for reasons unrelated to his report on Romic and request for an audit.

73. While those conclusions were a facially obvious effort at a whitewash, it is their stated factual underpinning that was so remarkable and that exposed that the Romic fraud was not simply a frolic and detour by Romic but endemic and widespread at Summit and sanctioned and encouraged by its CEO and directors.

74. With respect to Romic's fraud on September 9, Summit admitted that Romic had been told and that she clearly understood that there were only 15 stated accounts for which the overpaying customer was responsible. Thus, Summit admitted that it was at most only proper for her to spend the customer's overpayment to pay bills that the overpaying customer owed in those 15 accounts.

75. However, Summit stated that Romic had engaged in no wrongdoing because its documentary evidence established that Romic used the overpayment only to pay on those 15 appropriate accounts and there was only one exception – a single account that was not a competitor of the overpaying customer. Summit unambiguously and in writing insisted that its records established that there was only a single account not associated with the overpaying customer that Romic paid with the overpaying customer's money. Based squarely on that representation, Summit stated that Romic's payment to that one account was "a simple error."

76. Summit's documents (that Summit possessed, but did not realize that Poulos also possessed) established the contrary. Those documents established that, on September 9, Romic took and spent the overpaying customer's money to pay the overdue (and largely uncollectible) bills of ten (as opposed to one) different customers that were not on the admitted list of 15 accounts that were identified to Romic as being associated with the overpaying customer.

77. Even more, Summit's documents also established that the ten unrelated customers whose accounts Romic paid with the overpaying customer's money included arch rivals of the

overpaying customer, included accounts Romic had been told were uncollectible and not related to the overpaying customer, included accounts Romic had emailed about previously establishing her knowledge that they were not accounts of the overpaying customers, and included accounts that Romic selected to pay with another customer's money because they were the very specific category of aged overdue and uncollectible accounts Peterson had demanded that she "clean up."

78.   Summit's documents also established that, on September 10, Romic attempted to partially cover up her theft and fraud by actually changing the name of one of the ten accounts (that was a competitor of the overpaying customer) to falsely make it appear it was an account associated with the overpaying customer.

79.   Summit's records also established that Moeller herself identified these very ten accounts unrelated to the overpaying customer as being paid by Romic with the overpaying customer's money.

80.   In addition, Summit's records established that Romic effectively admitted her fraud to Summit when she was interviewed after Poulos' report.  She admitted that she may well have "cleaned up" accounts not associated with the overpaying customer.  Those same records established that Summit well knew that her conduct was no "simple error."

81.   Summit next claimed in its CRP Final Decision that its records established that "almost $60,000" of the approximately $60,000 overpayment was used by Romic to pay the 15 identified accounts that were connected to the overpaying customer.  Thus, according to Summit, any amount of the overpayment Romic spent to pay the single "simple error" bill that was not associated with the overpaying customer was virtually nil.

82.   However, Summit's own records established that, on September 9, Romic used well over $20,000 (as opposed to virtually nil) of the overpayment to pay bills of ten accounts for

which the overpaying customer was not responsible, including competitors of the overpaying customer.

83.  With respect to Poulos' report of Romic's conduct, Summit's CRP Final Decision stated that its records established two important facts inconsistent with Poulos' complaint.

84.  First, Summit stated that its records established that Poulos reported Romic's misconduct on September 18 instead of September 12 as alleged by Poulos.  Summit stated that it was very important that Poulos' report about Romic was on September 18 because Romic had sent Poulos emails on September 16 it deemed were critical of Poulos.  Thus, Summit represented that Poulos actually reported Romic's September 9 conduct on September 18 because he received her September 16 emails.  Accordingly, Summit stated that Poulos actually reported Romic because of "his concerns over his job performance" and in essence was retaliating against her because of her September 16 emails to him.

85.  As further support for that representation, Summit stated that, in reporting Romic's September 9 conduct, Poulos did "not suggest any wrongdoing" by Romic.

86.  Once again, Summit engaged in fraud as Summit's records established that Poulos had indeed reported Romic's conduct as he had alleged on September 12 instead of September 18.  Thus, he could not have been motivated to report Romic's misconduct by receiving September 16 emails he obviously had not received.

87.  Furthermore, directly contradicting the CRP Final Decision's representation that Poulos did not allege any wrongdoing by Romic, Summit's internal HR report stated that Poulos indeed had reported that Romic's conduct was "unethical" – the very word used in Summit's Code of Conduct to describe such wrongdoing.

88. In sum, Defendants' fraudulent cover up collapsed with its own documents. Poulos (through his counsel) wrote back to Summit (through its counsel) pointing out these and other contradictions between the CRP Final Decision and Summit's own documents. Summit could not defend itself as it had again been caught in fraud - this time by the highest levels at Summit in South Dakota. Thus, Summit was left with nothing to say and simply tendered Poulos' claim to an insurance company.

89. Accordingly, Peterson, Romic, and Moeller are still employed in their high paying jobs at Summit.

90. Romic – enabled by Summit's whitewash of her conduct – still handles the money of customers and shareholders.

91. Peterson's directive to "clean up" account receivables is still the rule and practice at Summit.

92. Boekelheide still oversees Summit and has ratified its business practices and fraud.

93. Summit's corporate customers are still in the dark about Summit's business practices. Summit still has not come clean with the overpaying customer. To do so, would expose Summit further. Actual and prospective shareholders still believe that Summit is an ethical company that follows legal business practices.

94. In the meantime, Poulos – who is 62 years old – looks for a job in a very difficult job market. He is out of work because he did what Summit as his fiduciary told him in writing he had a duty to do. He is out of work because he exposed a corrupt company in the interests of Summit's customers, shareholders, potential shareholders and the citizens of South Dakota.

## CLAIMS

## COUNT ONE

### (Tort: Wrongful Termination For Whistle Blowing Against Summit)

95.     Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 94 above as if set forth fully herein.

96.     Defendants' termination of Poulos contravened clear mandates of South Dakota public policy.  Poulos was terminated in retaliation for his whistle blowing that served a public purpose.

97.  Poulos reported that one or more substantial public policies may have been violated, including public policies from South Dakota's statutory and common law.

98.     Such policies include, but are not limited to, those in South Dakota's statutes prohibiting actual and attempted theft, actual and attempted theft by intent to deprive an owner of property that was delivered to Summit by mistake (SDCL § 22-30A-6; SDCL § 22-4-1), actual and attempted theft by obtaining property by deception (SDCL § 22-30-A-6; SDCL § 22-4-1), actual or attempted theft by taking property with the intent to deprive (SDCL § 22-30A-1; SDCL § 22-4-1); actual or attempted theft by misappropriation of money held in trust (SDCL § 22-30A-10; SDCL § 22-4-1), deceit (SDCL § 20-10-01 and SDCL § 20-10-02), fraud (SDCL § 47-31B-501; SDCL § 22-4-1), fraud by a corporate officer (SDCL § 47-3—03; SDCL § 22-4-1), intent to defraud by a corporate officer, director or agent (SDCL § 47-30-04), corporate officer, director, or agent preparing or concurring in a false written report (SDCL § 47-30-9), action by a corporate director which violates the law (SDCL § 47-30-10), fraud on shareholders (SDCL § 47-31A-101), false statement in document to obtain government assistance (SDCL § 22-29-11), public policy to protect whistle blowers (Dahl v. Combined Ins. Co., 2001 SD 12, 621 N.W.2d

163 (2001)), public policy to enforce contractual promises by employer (<u>Osterkamp v. Alkota</u> <u>Mfg., Inc.</u>, 1983 S.D. LEXIS 296, 332 N.W.2d 275 (1983)), and the public policy to enforce corporate promises to employees that they will not be disciplined for reporting corporate unethical conduct – particularly where the victims include customers and actual and potential shareholders and investors.

99.     In engaging in his whistle blowing, Poulos was promoting the public good and did not do so to protect his proprietary interests, exact revenge on Summit, or for personal gain.

100.     As a result of Defendants' tortious conduct, Plaintiff has suffered substantial damages. Defendants' conduct was willful and warrants substantial punitive damages.

## COUNT TWO

### (Tort:  Intentional Infliction Of Emotional Distress Against All Defendants)

101.     Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 100 above as if set forth fully herein.

102.     Defendants' conduct described above amounted to acts that were extreme and outrageous. Defendants intended by these acts to cause Plaintiff severe emotional distress and/or Defendants acted recklessly to cause severe emotional distress.  Plaintiff has suffered severe emotional distress because of the extreme and outrageous conduct by defendants, including stress, humiliation, and mental anguish.

103.     As a result of Defendants' tortious conduct, Plaintiff has suffered substantial damages. Defendants conduct was willful and warrants substantial punitive damages.

## COUNT THREE

### (Tort:  Breach Of Fiduciary Duty Against Summit)

104.    Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 103 above as if set forth fully herein.

105.    In requiring Plaintiff to report conduct he believed in good faith to be unethical and in promising that he would not be disciplined for any such report, Defendants owed Plaintiff a fiduciary duty.  Defendants placed themselves in a superior position exercising influence over Plaintiff and requiring Plaintiff to place his confidence and trust in Defendants.

106.  As such, Defendants had a fiduciary duty to act primarily for the benefit of Plaintiff when he made his good faith report of unethical conduct.  Instead, Defendants acted improperly and against the interests of Plaintiff by making false accusations against him, by making fraudulent representations to him, and by terminating him for conduct it required him to undertake after promising it would not terminate him for doing so.

107.    As a result of Defendants' tortious conduct, Plaintiff has suffered substantial damages.  Defendants' conduct was willful and warrants substantial punitive damages.

## COUNT FOUR

### (Tort: Deceit Against All Defendants)

108.    Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 107 above as if set forth fully herein.

109.    In stating in writing in to Poulos that he was required to report conduct he believed in good faith and in representing in writing that he would not be disciplined for it, Defendants asserted facts and representations that they knew were not true and made a promise that they had no intention of performing.

20

110.   Poulos reasonably relied upon Defendants' deceitful statements and promises and was damaged by that reliance.

111.   As a result of Defendants' tortious conduct, Plaintiff has suffered substantial damages. Defendants' conduct was willful and warrants substantial punitive damages.

## COUNT FIVE

### (Tort: Civil Conspiracy Against All Defendants)

112.   Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 111 above as if set forth fully herein.

113.   Defendants engaged in an agreement to commit the torts against Plaintiff set forth above.

114.   Each Defendant (a) engaged in an agreement with one or more other persons and (b) had a meeting of the minds on the object or course of action to be taken to commit one or more unlawful acts.

115.   Plaintiff suffered substantial damages as a proximate result of Defendants' conspiracy. Defendants' conduct was willful and warrants substantial punitive damages.

## COUNT SIX

### (Breach Of Contract Against Summit)

116.   Plaintiff repeats and incorporates by reference all of the allegations set forth in paragraphs 1 through 115 above as if set forth fully herein.

117.   Summit's employment agreement with Poulos set forth what is legally an exception to the employment-at-will rule:  Summit told Poulos in writing that he had a duty to report any conduct he believed in good faith was unethical and promised that he would not be disciplined or terminated if he did so.  Summit's unambiguous and unqualified promise here was

an exception (either implied or by application of contract interpretation doctrines applying the more specific provision if it contradicts a more general provision) to the general statement that Poulos was employed by Summit at-will.

118.   Poulos fulfilled his mandate to report conduct he believed to be unethical.  Summit disciplined and then terminated him for doing so.  Summit breached its enforceable contractual promise.

119.   Plaintiff has suffered substantial damages as a proximate cause of Summit's breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

A.   That judgment be entered in favor of Plaintiff and against Defendants awarding Plaintiff all remedies available under the claims including but not limited to, front pay and benefits, back pay and benefits, compensatory damages, punitive damages, interest, fees, and costs in an amount exceeding $10 million;

B.   That Plaintiff be awarded his costs and attorneys fees for all costs and fees incurred in connection with this matter; and

C.   That Plaintiff be awarded such other and further relief that the Court deems just and equitable.

Dated this 11th day of May, 2009.

JOHNSON, HEIDEPRIEM,
ABDALLAH & JOHNSON, L.L.P.

BY _____
Scott A. Abdallah  (sabdallah@jhajlaw.com)
Pamela R. Bollweg  (pamela@jhajlaw.com)
P.O. Box 2348
Sioux Falls, SD 57101-2348
(605) 338-4304

*Attorneys for the Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands trial by jury on all issues so triable.

_____
Scott A. Abdallah
Pamela R. Bollweg