**FILED**

SEP 10 2010



CLERK

| PETER POULOS, | * | CIV 09-4062-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING IN PART AND |
| SUMMIT HOTEL PROPERTIES, LLC, | * | DENYING IN PART |
| SUMMIT GROUP, INC., AND TRENT | * | DEFENDANTS' MOTION FOR |
| PETERSON, | * | SUMMARY JUDGMENT |
| | * | |
| Defendants, | * | |
| | * | |

## I. INTRODUCTION

On May 3, 2010, Defendants moved for summary judgment (Doc. 60) on all of

Plaintiff Poulos' claims. Poulos opposed the motion for summary judgment. Defendants

filed a reply, and Plaintiff was granted an opportunity to file a sur-reply. This Court held a

hearing on the motion, has considered all the pleadings, and now grants in part and denies in

part Defendants' motion for summary judgment.

## II. FACTS

When considering a motion for summary judgment, this Court is obliged to construe

the "record in the light most favorable to the non-moving party . . . and . . . afford [the non-

moving party] all reasonable inferences to be drawn from that record." Davis v. Hall, 375

F.3d 703, 711 (8th Cir. 2004).

Plaintiff Peter Poulos is a Georgia resident and was employed by Summit Hotel

Properties LLC ("Summit Hotel") to be the general manager of a Hyatt Place hotel located

-1-

near the Atlanta, Georgia airport. Summit Hotel is a South Dakota limited liability company

that owns approximately 60 hotels throughout the United States. Summit Hotel's day-to-day

operations are managed by Summit Group, Inc. ("Summit Group"), an affiliated South

Dakota corporation. In addition to providing management services, Summit Group owns

approximately 49% of Summit Hotel's outstanding membership units. Summit Hotel and

Summit Group (collectively "Summit") share the same principal place of business in Sioux

Falls, South Dakota. Defendant Trent Peterson serves as Summit Group's Director of

Operations for the Eastern United States, resides in South Dakota, and works at Summit

Group's Sioux Falls headquarters.

When Poulos initially became an Atlanta Hyatt Place employee, Poulos received an

employee handbook ("the Handbook"). The Introduction to the Handbook stated:

**THIS EMPLOYEE HANDBOOK IS NOT, AND DOES NOT CREATE, A
CONTRACT BETWEEN YOU AND THE EMPLOYER.** You do not have any
contract or other commitment for any specific term or condition of employment. The
Employee Handbook only provides general guidelines regarding the procedures of the
Employer, and the Employer reserves the right to modify, delete from, or add to any
of the guidelines outlined in the Handbook without notice.

(Doc. 64-9, at 6) (emphasis in original).

When given the Handbook, Poulos signed a receipt page, dated March 5, 2007,

acknowledging that he was:

an "at-will" employee with the Employer. The term "at will" means that neither the
Employer nor I have committed to any specific term of employment, and either I or
the Employer can end my employment at any time, for any reason, without notice.
THERE IS NO CONTRACT BETWEEN THE EMPLOYER AND ME.

(Doc. 64-10, at 2) (emphasis in original).

The Handbook contained a chapter entitled "Professional Conduct," which contained

a subsection entitled "Code of Business Conduct and Ethics," ("the Code of Ethics") which

-2-

in turn included a provision entitled "Reporting any Illegal or Unethical Behavior" ("the

Whistleblower Provision"). Summit Hotel filed the "Professional Conduct" chapter,

including the entire Code of Ethics, with the Securities and Exchange Commission ("SEC")

as an Exhibit to its form 10-K. (Doc. 70-2). The "Whistleblower Provision" of the Code of

Ethics stated:

> Employees are responsible for being aware of the Employer's policies applicable to
> their activities and to comply with them fully. Employees also have a duty to report
> any apparent misconduct through appropriate channels which may be established
> within the Employer for such purposes, and to assist the Employer in the prevention
> and correction of such problems. Employees are encouraged to talk to supervisors,
> managers, or other appropriate personnel about observed illegal or unethical behavior.
> Employees who know or have good reason to believe that other employees are
> engaged in conduct violating this policy should report this to the Employer. *No*
> *supervisor shall retaliate against an employee, either directly or indirectly, who in*
> *good faith and in accordance with the Employer's procedure, reports an act of*
> *apparent misconduct.* Failure of any employee to comply with such policies will
> result in disciplinary action, which may include termination.

(Doc. 64-9, at 3, 15) (emphasis in original).

In late-January of 2008, Poulos became the Atlanta Hyatt Place's general manager.

As general manager, Poulos agreed to a restrictive covenant dated February 1, 2008, which

expressly provided that he was an at-will employee. (Doc. 64-8, "General Manager's

Restrictive Covenant dated 2/1/2008"). The restrictive covenant contained an "Applicable

Law" provision stating that "[t]his Agreement and the rights and obligations of the parties

hereunder shall be construed, interpreted and enforced in accordance with, and governed by,

the laws of the State of South Dakota, exclusive of the choice-of-laws rules hereunder." (Id.

at 3).

As general manager, Poulos was responsible for the Atlanta Hyatt Place's entire

operations, including managing and collecting the hotel's accounts receivable. Poulos

-3-

reported to a regional manager for Summit Group named Stephanie Romic.

In March and April of 2008, two members of Summit management complimented Poulos for doing a "great job." (Doc. 70-4, emails from Keenan Wells and Trent Peterson). Poulos received a performance review in April of 2008 indicating that he met or exceeded Summit's company standards. (Doc. 70-5, April 2008 Performance Review). The financial performance of the Atlanta Hyatt Place was good, which resulted in Peterson thanking Poulos for his hard work in July of 2008. (Doc. 70-6, July 11, 2008 email from Peterson to Poulos).

In April of 2008, certain employees of Delta Airlines ("Delta") stayed at the Atlanta Hyatt Place during an extended training event, incurring a bill totaling $60,569.30. Delta did not immediately pay the bill. Poulos contacted a company that worked with Delta and asked for assistance obtaining payment from Delta. In July of 2008, the Atlanta Hyatt Place received a check for $60,569.30 from Delta and deposited it. Two days later, the hotel received a second check from Delta for the same amount. After consulting with Romic, Poulos deposited the second check in the hotel's bank account, but did not post it against any bills at that point.

On August 21, 2008, Summit Group's accounting department sent an email message to Poulos with a copy to Romic asking whether Poulos had sent a letter to Delta advising that the second check had been applied against Delta's other outstanding bills. On September 2, 2008, Poulos responded that he had discussed the issue with Romic, and if "we don't have a specific answer back from Delta as to which . . . invoice they want us to credit this to by next Tuesday, we will begin posting on the check to their oldest invoice and go forward from there." Romic requested to be copied on Poulos' communications with Delta.

-4-

Poulos attempted to call someone he knew at Delta with responsibility over accounts payable, but was told that employee had retired. Poulos did not ask who succeeded that employee. Poulos never sent a letter or email to Delta about the double payment.

On September 9, 2008, Romic arrived at the Atlanta Hyatt Place for a regularly scheduled visit. During that visit, Romic asked Poulos and the assistant general manager, Cynthia Dorsey, to identify all the unpaid accounts for which Delta was responsible. Poulos recalled that Delta had approximately 15 unpaid accounts totaling between $26,000 and $30,000 at the time. According to Poulos, Romic directed Poulos to post the entire $60,569.30 of the second Delta check against not only unpaid Delta accounts, but also accounts owed by entities unaffiliated with Delta.

Two days later, on September 11, 2008, Poulos reviewed the postings and at that time realized the impropriety of using Delta funds to pay off accounts of non-Delta entities. On September 12, 2008, Poulos called Summit Group's chief operating officer, Craig Aniszewski, to report the posting of Delta funds to non-Delta accounts. Poulos reported the events of September 9, 2008, to Aniszewski ostensibly because Poulos felt that he had a fiduciary duty to report them under the Code of Ethics and believed Romic to have done something unethical and illegal through the postings. (Doc. 70-3, "Copies of cited pages from the Deposition of Poulos," at 22). Aniszewski thanked Poulos and said that he would call back to let Poulos know what would happen.

Summit investigated the check-posting incident and determined that some amounts had been posted against bills for which Delta had no responsibility. During this investigation, Romic admitted that "not every single [account was] affiliated with Delta" and

-5-

that she "probably cleaned up some things that didn't need to be cleaned." (Doc. 64-26, at 2, Amy Schlagel Sept. 18, 2008 Memorandum). Summit issued a warning to Romic and suspended her briefly in September of 2008 for using poor judgment concerning the postings to non-Delta accounts. (Id.; Doc. 64-6, Aniszewski Aff. ¶ 9; Doc. 64-26, Schlagel Memo); Doc. 64-16, Warning to Romic). Poulos contends that Romic's suspension was part of a cover-up. Following the investigation, Summit assigned supervision of Poulos and the Atlanta Hyatt Place to another regional manager, Janis Moeller. (Doc. 64-6, Aniszewski Aff. ¶ 9).

By the end of September of 2008, Summit had identified all but one - a charge for $301 -of the improper postings from September 9. (Doc. 70-13, at 2, September 29, 2008, Moeller to Peterson email). Summit claims that it ultimately concluded that Romic had not intentionally applied Delta funds to non-Delta accounts, but that she should have been more thorough before posting against the check. Poulos disputes this, contending that Summit understood Romic to have engaged in criminal theft evidenced by the posting from Delta funds to various non-Delta accounts including Air Tran, Alliance, Expedia/Travelscape, Swissport, and Tourico. (Doc. 42-1, at 3, Def's. Supp. Ans. to Interrogatories and Reqs. For Prod. of Docs.). Poulos maintains that - rather than reporting that Romic had used Delta funds to pay for non-Delta accounts - Summit concealed the alleged theft from Delta.

In late-September of 2008, Moeller and Dorsey reversed all the postings done by Romic and Poulos. Dorsey then sent a letter to Delta on October 10, 2008, stating that the Atlanta Hyatt Place had a $60,569.30 check that appeared to be a duplicate payment and would apply the funds to Delta's outstanding balances unless Delta responded by October 23,

2008. (Doc. 64-17, Oct. 10, 2008, Letter from Cynthia Dorsey to Myra Simpson). Receiving no response from Delta, the hotel applied the funds to Delta's balances, and refunded the surplus to Delta, which amounted to $32,318.83. (64-18, Letter to Delta dated 11/4/2008). Poulos contends that Summit's letter misled Delta in stating that the check "appears to be a duplicate payment" rather than revealing a theft by Romic.

On October 1, 2008, Moeller issued a written warning to Poulos concerning his job performance. Poulos disputes that his job performance was the true reason for the warning, while Summit submits that Moeller was genuinely disappointed in Poulos' lack of knowledge and competence on some tasks expected of a hotel general manager. On November 1, 2008, Moeller issued a second written warning to Poulos. Unbeknownst to Poulos, Summit allegedly posted a job opening for Poulos' position on November 4, 2008. Summit claims that it tried to reach Poulos on November 11, 2008, about a personnel issue, but could not locate him. On November 12, 2008, Poulos had a telephone conversation with Peterson, during which Peterson told Poulos that he could either resign by the end of the day or be terminated within two weeks. According to Poulos, Peterson screamed at Poulos during this telephone conversation. On November 13, 2008, Moeller personally delivered to Poulos a letter written by Peterson whereby Summit Group accepted Poulos' resignation. Poulos told Moeller that he had not resigned, but Moeller nevertheless asked Poulos to leave the Atlanta Hyatt Place. Poulos then left the hotel. Moeller did not yell at Poulos during the conversation.

Poulos asserts that he was terminated in retaliation for reporting Romic's conduct. Poulos admits that he had a few performance issues as a general manager, but submits that he

-7-

did not deserve to be terminated.

Poulos allegedly has suffered emotional distress because of the actions of Summit and Peterson in terminating Poulos' employment, (Doc. 64-1, Peter Poulos Depo. Excerpts, at 281), and has seen Dr. Shashikani Daya for health effects worsened by Defendants, (Id., at 281-82), including a prior heart condition, shock, and humiliation. (Id. at 236, 283). Poulos has not designated any medical experts, whether retained or treating, who will opine that Poulos has suffered adverse health effects from stress related to his alleged termination. However, Poulos has identified his treating physician as a non-expert witness.

## III. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In a determination of whether summary judgment is warranted, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, No. 09-1788, 2010 U.S. App. LEXIS 14007, at *3 (8th Cir. July 9, 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). "If opposing parties tell two different stories, the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." Id. (internal quotations omitted). A party opposing a properly made and supported motion for summary judgment "may not rely merely

-8-

on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor." Adam v. Stonebridge Life Ins. Co., No. 09-3014, 2010 U.S. App. LEXIS 14492, at *8 (8th Cir. July 15, 2010) (quoting Roeben v. BG Exelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)).

## B. Poulos' Contract Claims

### 1. Count VI: Breach of Contract Against Summit

The parties agree that South Dakota law applies to the contract claim in Count VI based on the enforceable choice-of-law provision in the restrictive covenant signed by Poulos designating South Dakota law as applicable to "[the restrictive covenant] and the rights and obligations of the parties [t]hereunder." (Doc. 64-8, at 3). Among other things, the restrictive covenant specified that, as general manager of the Atlanta Hyatt Place, Poulos was an employee at-will. (Id. at 2). South Dakota law in turn provides that employment having no specified term may be terminated at the will of either party. SDCL 60-4-4 ("An employment having no specified term may be terminated at the will of either party on notice to the other, unless otherwise provided by statute.").

In Count VI, Poulos claims that the Whistleblower Provision in both the Handbook and the SEC filing of Summit Hotel altered Summit's right to terminate him as an at-will employee. An employment handbook can alter an employee's at-will status in South Dakota, but to do so, "the handbook must contain language indicating a clear intention on the employer's part to surrender its statutory power to terminate its employees at will."

-9-

Butterfield v. Citibank, N.A., 437 N.W.2d 857, 859 (S.D. 1989). The Supreme Court of

South Dakota has held that no alteration of the at-will employment relationship results from a

handbook containing language negating an intent to alter an employee's at-will status.

Johnston v. Dlorah, Inc., 529 N.W.2d 201, 202-03 (S.D. 1995) (handbook language

providing that plaintiff's job category was non-contractual and indefinite did not indicate

intent to create a binding contract); Peterson v. Sioux Valley Hosp. Ass'n, 486 N.W.2d 516,

520 (S.D. 1992) (handbook language providing that employee handbook provisions served

"only as a guide to the hospital's policies and rules and not as a contract of employment" did

not indicate intent to create a binding contract).

The documents in this case do not contain a clear intention, as required by Butterfield,

for Summit to have surrendered its right to terminate Poulos at-will. To the contrary, the

Handbook contained a clear reservation of at-will status for Poulos. The applicable language

stated:

> **THIS EMPLOYEE HANDBOOK IS NOT, AND DOES NOT CREATE, A
> CONTRACT BETWEEN YOU AND THE EMPLOYER.** You do not have any
> contract or other commitment for any specific term or condition of employment. The
> Employee Handbook only provides general guidelines regarding the procedures of the
> Employer, and the Employer reserves the right to modify, delete from, or add to any
> of the guidelines outlined in the Handbook without notice.

(Doc. 64-9, at 6) (emphasis in original).

In addition, Poulos signed a receipt page acknowledging that he remained:

> an "at-will" employee with the Employer. The term "at will" means that neither the
> Employer nor I have committed to any specific term of employment, and either I or
> the Employer can end my employment at any time, for any reason, without notice.
> THERE IS NO CONTRACT BETWEEN THE EMPLOYER AND ME.

(Doc. 64-10, at 2) (emphasis in original). The language of the Handbook did not alter

Poulos' at-will status.

Poulos, in support of the breach of contract claim of Count VI, argues that the Whistleblower Provision of the Handbook, under Butterfield, establishes a clear intention by Summit to surrender its power to terminate at-will because the Whistleblower Provision was filed separately with the SEC. Poulos argues that the Whistleblower Provision constitutes a separate document governing the employment relationship, apart from its inclusion in the Handbook and not subject to the Handbook's at-will disclaimer. In support, Poulos cites authority in which an at-will disclaimer existed in an employee handbook but not in a separate employer compliance manual. Greene v. Quest Diagnostics Clinical Labs., Inc., 455 F. Supp. 2d 483 (D.S.C. 2006). In Greene, the compliance manual provided that "[t]here will be no repercussions to you for having reported in good faith any suspected misconduct or non-compliance." Id. at 486. The court, applying South Carolina law, held that a breach of contract claim based on the compliance manual raised a jury issue because the compliance manual did not contain disclaimers and "when there is a dispute over whether language in a handbook or other document creates a binding promise, particularly, in the absence of a disclaimer, that dispute should be resolved by a jury." Id. at 491-92 (also noting that the issue should be decided by a jury when the "contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference"). In a similar case, a court reversed summary judgment for a defendant on a breach of contract claim when, although a human resources manual contained a disclaimer that it should not be construed as a contract, plaintiff relied upon a harassment provision within a separate code of ethics without such a disclaimer. Nichols v. Xerox Corp., 825 N.Y.S.2d 847 (N.Y. App. Div. 2006).

Unlike the situations in Greene and Nichols, in which the plaintiffs received, separate from an employee handbook, a document containing the provision at issue, Poulos concedes that he had neither received nor read Summit's SEC filing containing the Whistleblower Provision. Rather, Poulos received the Whistleblower Provision only as a part of the Handbook, which explicitly stated that the employment relationship remained at-will. Poulos presented no evidence concerning any communications between the parties regarding the SEC filing. As a result, the existence of the SEC filing containing the Whistleblower Provision does not establish a clear intention by the parties to negate Poulos' employment at-will status.

Poulos also argues that the Whistleblower Provision, even if deemed part of the Handbook, is enforceable because it and the disclaimer are in conflict and "[w]hen provisions conflict and full weight cannot be given to each, the more specific clauses are deemed to reflect the parties' intentions - a specific provision controls a general one." Prunty Constr., Inc. v. City of Canistota, 2004 SD 78, ¶ 16, 682 N.W.2d 749, 756 (internal citations omitted). Poulos attempts to distinguish the cases cited by Summit by asserting that the Handbook disclaimer is in direct conflict with the more specific non-retaliation term of the Code of Ethics. In support, he cited Seiter v. Yokohama Tire Corp., No. C08-5578 RBL, 2010 U.S. Dist. LEXIS 9266 (W.D. Wash. Feb. 3, 2010) (applying Washington law, when handbook included anti-retaliation provision for whistleblowing and a contrary disclaimer statement, there was a genuine issue of material fact for the jury on breach of contract claim). However, the provisions at issue in this case do not conflict, because the Handbook specifies that the Whistleblower Provision is merely a guideline rather than mandatory. (Doc. 64-10, at 2

("The Employee Handbook only provides general guidelines regarding the procedures of the Employer, and the Employer reserves the right to modify, delete from, or add to any of the guidelines outlined in the Handbook without notice.")).

The Whistleblower Provision did not alter Poulos' at-will employment status, because the Handbook containing the Whistleblower Provision was explicit in preserving the at-will relationship. Therefore, summary judgment will enter on Count VI alleging breach of the employment contract as a result of Poulos' termination of employment.

## 2. Count I: Wrongful Termination for Whistleblowing Against Summit

Poulos pleads a claim for wrongful termination for whistleblowing in Count I of his Complaint. Poulos concedes that "Georgia law does not recognize a whistleblower public policy exception to Georgia's employment at-will doctrine." (Doc. 68, Pl's Opp. to Defs.' Mot. Summ. Judgment, at 18) (citing Eckhardt v. Yerkes, 254 Ga. App. 38, 39, 561 S.E.2d 164, 166 (2002) (affirming dismissal because "the legislature has not created a public policy exception that would allow a plaintiff to recover on a claim of wrongful termination for whistleblowing")). Consequently, Poulos' claim in Count I cannot survive summary judgment if Georgia law applies to the claim.

South Dakota law differs materially from Georgia law on this claim. "In South Dakota, employment without a specified term is on an 'at-will' basis for which employment can be terminated with or without cause by notice of either party." Anderson v. First Century Fed. Credit Union, 2007 SD 65, ¶ 18, 738 N.W.2d 40, 45 (2007) (citing SDCL 60-4-4). South Dakota has "recognized exceptions to this doctrine where an 'at-will' termination is

-13-

contrary to public policy." Id. The Supreme Court of South Dakota has adopted "a narrow public policy exception to the at-will doctrine" permitting an employee "a cause of action for wrongful discharge when the employer discharges him in retaliation for his refusal to commit a criminal or unlawful act." Johnson v. Kreiser's Inc., 433 N.W.2d 225, 227 (S.D. 1988). In doing so, the court "conclude[d] that a contract action for wrongful discharge is more appropriate than a tort action," and that "contract action is predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform a criminal or unlawful act." Id. (citing Brockmeyer v. Dun & Bradstreet, 335 N.W.2d 834 (Wis. 1983) (emphasis added). Poulos' Complaint characterized Count I as a tort claim. Nevertheless, it is an otherwise properly pled wrongful and retaliatory discharge claim, which is a contract claim under South Dakota law.

In Dahl v. Combined Ins. Co., 2001 SD 12, 621 N.W.2d 163, the Supreme Court of South Dakota "expanded the public policy exception to include cases in which the plaintiff was terminated for reporting unlawful or criminal conduct to a supervisor or outside agency, essentially whistleblower protection." Smoot v. Am. Tissue Servs. Found., No. 06-4084, 2009 U.S. Dist. LEXIS 13728, at *12-13 (D.S.D. Feb. 20, 2009) (citing Dahl). Dahl applied South Dakota public policy to allow a whistleblowing claim in a manner that "tempered" the "harsh effects of the at-will employment doctrine . . . " Jarman v. Barndt, No. 03-5064, 2006 U.S. Dist. LEXIS 2650, at *18 (D.S.D. Jan. 12, 2006). The Supreme Court of South Dakota in Dahl noted that:

> [w]histleblowing, or the reporting of unlawful or criminal conduct to a supervisor or outside agency, plays an invaluable role in society. As recognized by courts considering this issue, public policy favors the exposure of crime, and the cooperation

-14-

of citizens possessing knowledge thereof is essential to effective implementation of that policy. Persons acting in good faith who have probable cause to believe crimes have been committed should not be deterred form reporting . . . . Indeed, there is no public policy that can be said to be more basic or necessary than the enforcement of the state's criminal code or the protection of the life and propriety of its citizens. The laws of the State of South Dakota evidence this basic understanding. See e.g., SDCL 22-11-12 (mandating that any person with knowledge of a felony report the same to the proper authorities or be subject to a class 1 misdemeanor) . . . The law is feeble indeed if it permits [an employer] to take matters into its own hands by retaliating against its employees who cooperate in enforcing the law. [T]he employees' dilemma is one of balancing a public interest against the potential of private loss, with the employee losing either way. We have recognized that when faced with such a dilemma many employees . . . would choose to retain their jobs. Such a result is untenable for the employee and the citizens of South Dakota.

621 N.W.2d at 167-68 (internal citations omitted).

Because wrongful discharge for whistleblowing constitutes a cause of action in contract under South Dakota law, the contractual choice-of-law provision designating South Dakota law as applicable to "the rights and obligations of the parties" under the restrictive covenant governs Count I. (Doc. 64-8). Both Poulos and the defendants agreed in briefing that South Dakota law governs any contract claim in this case.[1]

Summit argues that even under South Dakota law, Count I still cannot survive summary judgment because Poulos did not have probable cause to believe that unlawful conduct had occurred. One element of a whistleblowing claim in South Dakota is that the report was made in good faith and with probable cause to believe that illegal activity occurred. Anderson, 2007 SD 65, ¶ 19, 738 N.W.2d at 46. Summit contends that Poulos

---

[1](Doc. 62, Defs.' Br. in Support of Motion for Summary Judgment, at 15 ("Poulos' employment agreement contains a choice of law clause providing that it is governed by South Dakota law . . . Since South Dakota law was selected in this instance, the clause is enforceable."); Doc. 77, Defs.' Reply Br. in Support of Mot. for Summary Judgment, at 19 ("The parties agree that Poulos' breach of contract claim is governed by South Dakota law.")). Plaintiff argued that South Dakota law applies to all claims in this case, whether contract or tort.

cannot prove this element because businesses legally may "setoff" or "offset" an

overpayment against other outstanding debts owed by the same company. See Hoaas v.

Griffiths, 2006 SD 27, ¶ 20, 714 N.W.2d 61, 67 ("The right of setoff (also called 'offset')

allows entities that owe each other money to apply their mutual debts against each other,

thereby avoiding 'the absurdity of making A pay B when B owes A.") (quoting Citizens

Banks of Md. v. Strumpf, 116 S.Ct. 286, 289 (1995))).

Poulos counters that he had probable cause to believe Romic acted unlawfully

because Romic made Poulos post over $60,000 of Delta money to various accounts when

Romic knew that Delta only owed approximately $30,000 to the Atlanta Hyatt Place. The

initial postings exceeded any right of setoff and indeed covered bills owed by entities not

affiliated with Delta. Summit posits an alternative explanation of what happened, why

Poulos allegedly quit, and why (if he did not quit) he was terminated. These are genuine

issues of material fact for determination by a jury on the claim of wrongful discharge for

whistleblowing. See Dahl, 2001 SD 12, ¶ 10, 621 N.W.2d at 166-67. Therefore, applying

South Dakota law, this Court denies Summit's motion for summary judgment on Count I of

the Complaint.

## C. Choice of Law on Tort Claims in Counts II through V

Federal courts in diversity jurisdiction cases apply the choice-of-law rules of the

forum state. Cicle v. Chase Bank USA, 583 F.3d 549, 553 (8th Cir. 2009) (citing Prudential

Ins. Co. of America v. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007)). The parties agreed that

South Dakota law governs the contract claims, but disputed whether South Dakota or Georgia

law governs Poulos' tort claims. The parties agreed at the hearings on Defendants' Motion for Summary Judgment that no material difference exists between Georgia and South Dakota law with respect to Counts II, III, IV, and V. The Court finds that whether South Dakota or Georgia law applies to the tort claims would not affect the Court's ultimate summary judgment determination on Counts II through V, because the applicable South Dakota and Georgia laws are substantially similar.

## D. Poulos' Tort Claims

### 1. Count II: Intentional Infliction of Emotional Distress Against All Defendants

Poulos claims that Peterson's conduct and the termination of Poulos' employment support a claim for intentional infliction of emotional distress ("IIED"). However, under both Georgia and South Dakota law, this claim fails because no genuine issue of material fact exists concerning the fact that Peterson's alleged conduct in ending Poulos' employment was not extreme and outrageous in the context of an IIED claim, and the emotional distress allegedly suffered by Poulos was not severe. The claimed wrongful termination of Poulos did not constitute extreme and outrageous behavior, and Poulos has submitted no evidence of severe emotional distress.

Under Georgia law, there are four essential elements of an IIED action: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." Jarrard v. United Parcel Serv., Inc., 529 S.E.2d 144, 146 (Ga. App. 2000); see also Odem v. Pace Academy, 510 S.E.2d 326, 332 (Ga. App. 1999). "Whether a claim rises to the requisite level of outrageousness and

-17-

egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." Odem, 510 S.E.2d at 332 (quoting Taylor v. Gelfrand, 505 S.E.2d 222 (1998)). It is not sufficient that a defendant acted with a tortious, criminal, or malicious intent, or even with "a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Id. Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. This "does not include mere insults, indignities, threats, annoyances, petty oppressions, or other vicissitudes of daily living." Jarrard, 529 S.E.2d at 147.

South Dakota law on IIED is substantially similar. South Dakota's IIED law contains the same elements as Georgia's. See Nelson v. WEB Water Dev. Ass'n, 507 N.W.2d 691, 698-99 (S.D. 1993). In South Dakota, the elements for establishing a prima facie case of IIED are:

(1) an act by defendant amounting to extreme and outrageous conduct;
(2) intent on the part of the defendant to cause plaintiff severe emotional distress;
(3) the defendant's conduct was the cause in-fact of plaintiff's distress;
(4) the plaintiff suffered an extreme disabling emotional response to the defendant's conduct.

Id. at 698. "The initial determination of whether the defendant's conduct is extreme enough to permit recovery belongs to the trial court. Id. at 698-99 (citing Tibke v. McDougall, 479 N.W.2d 898 (S.D. 1992) (citing Restatement (Second) of Torts § 46 comment (d))). "For conduct to be outrageous, it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Stene v. State Farm Mut. Auto. Ins. Co., 1998 SD 95, ¶ 32, 583 N.W.2d 399, 404 (internal

-18-

citation omitted).

The alleged conduct forming the basis of the IIED claim does not constitute behavior of the extreme and outrageous degree necessary to sustain an IIED claim. Poulos bases his IIED claim on the allegation that his termination was motivated by a desire by Defendants to retaliate against Poulos for reporting the check-posting incident. Poulos also claims that, during his November 11 telephone conversation with Peterson, Peterson lost his temper and "screamed" at Poulos to submit his resignation or else he would be terminated in two weeks. (Doc. 64-1, at 256-57). However, as a matter of law, loud threats at someone over the phone do not constitute the requisite extreme and outrageous behavior for an IIED claim. See Moses v. Prudential Ins. Co., 369 S.E.2d 541, 542-44 (Ga. App. 1988) (threatening and offensive phone message from former employer was not extreme and outrageous); Amstadter v. Liberty Healthcare Corp., 503 S.E.2d 877, 881 (Ga. App. 1998) (termination accompanied by alleged threat to sue or "ruin" employee constitutes "mere insults and indignities" rather than extreme and outrageous behavior); Citibank, N.A. v. Hauff, 2003 SD 99, ¶ 26, 29, 668 N.W.2d 528, 536 (threats of garnishment made over the telephone, as a matter of law, were not sufficiently outrageous to constitute an IIED claim because such threats do not constitute criminal conduct).

Poulos' IIED claim also fails because he cannot establish the element of severe emotional distress, which requires a plaintiff to show that the "distress inflicted is so severe no reasonable man could be expected to endure it." Odem, 510 S.E.2d at 333 (quoting Peoples v. Guthrie, 199 Ga. App. 119, 121-22 (1991); see also Anderson, 2007 SD 65, ¶ 39, 738 N.W.2d at 52 (holding that high blood pressure allegedly caused by stress at work,

-19-

difficulty sleeping, and irritability allegedly resulting from plaintiff employee blowing the whistle on a senior officer of employer were conditions "no more than ordinary and do not rise to the level necessary to sustain a claim" of IIED). Although he argues that the stress of being terminated impacted his health, Poulos does not contend that he has suffered any specific medical injuries. (Doc. 64-1, at 281). Poulos saw Dr. Shashikant Daya for high blood pressure and cholesterol, but Poulos admitted that he had high blood pressure prior to his termination and that his high cholesterol "isn't related to anything with Summit or the Defendants." (Id. at 281-82). Poulos did not introduce any medical records of any ailments or designate an expert to testify regarding any ailments, and the record contains no evidence that Poulos has suffered any stress beyond the normal amount anyone would experience upon losing a job.[2] Summary judgment is proper on an IIED claim when a plaintiff fails to introduce competent medical evidence that his conditions were caused by the alleged discharge and the conditions "are no more than ordinary." Anderson, 2007 SD 65, ¶ 39, 738 N.W.2d at 52.

Poulos cited one South Dakota case in which he contends a plaintiff suffering less than Poulos prevailed on an IIED claim. However, the breadth and depth of the employer's

---

[2]Poulos testified that even his own doctor has not offered the opinion that Poulos has suffered negative health impacts due to Summit's alleged acts:

Q.    Your doctor - I'm not going to get his name right.
A.    Dr. Daya.
Q.    Has he given you any opinions as to that your health has been adversely impacted due to any of the actions or inactions of the Defendants?
A.    I don't think we spent time on that, considerable time on that. Just being unemployed and that fact is - really covered it.

(Doc. 64-1, Poulos Depo., at 284).

-20-

conduct in that case was far more egregious than anything that Poulos alleged happened to

him. In that case, Petersen v. Sioux Valley Hosp. Ass'n, 486 N.W.2d 516 (S.D. 1992), the

court examined the following conduct forming the basis of Petersen's IIED claim: Petersen's

supervisor (1) called her into his office on ten occasions to discuss co-worker complaints and

absences; (2) confronted her in an abrupt and accusatory manner; (3) refused to identify to

Petersen the co-workers who complained about her; (4) raised the death of her child as a

possible explanation for her behavior; (5) encouraged her to disclose her medical problems to

her co-workers in the hopes of ending strife (6) sent her to personnel regarding her

personality conflicts with co-workers; (7) set up a meeting with co-workers without first

telling her; and (8) allowed her co-workers to confront her directly with their complaints.

The Supreme Court of South Dakota reversed summary judgment because "when viewing the

evidence most favorably to Petersen, the failure to warn her as to the nature of the September

meeting could be considered reckless, given [supervisor's] knowledge of Petersen's fear of

confrontational group meetings." Id. at 519-20. However, a number of South Dakota cases

affirm grants of summary judgment where the alleged conduct was worse than what Poulos

claims to have encountered. See, e.g., Harris v. Jefferson Partners, L.P., 2002 SD 132, 653

N.W.2d 496 (affirming dismissal of IIED claim when defendant bus driver demonstrated

"callous indifference" to plaintiff passenger's physical injury by refusing to call ambulance,

because such conduct did not amount to "an extreme outrage"); Gilchrist v. Trail King Indus.,

2000 SD 67, 612 N.W.2d 10 (affirming summary judgment on IIED claim when defendant

rehabilitation company allegedly sent representatives to attend plaintiff's personal physician

visits over his objections and then discussed plaintiff's private personal conditions with his

doctors in his presence with the intent to report the results to others); Tibke v. McDougall, 479 N.W.2d 898 (S.D. 1992) (affirming summary judgment on IIED claim including allegations that defendants terminated plaintiffs' membership in horse club; barred plaintiffs from club-sponsored horse shows and events, knowing this would diminish the value of plaintiffs' horses and services; and began campaign of malicious and false statements against one plaintiff, including statements that plaintiff had "indecently exposed" herself at a horse show, that she was a "trouble maker" whom "we are going to get rid of," that "her behavior was unbecoming of a professional trainer," and that plaintiff "lies all the time," as well as a statement describing plaintiff as "that bitch of a trainer.").

## 2. Count III: Breach of Fiduciary Duty Against Summit

In Count III, Poulos claims that Summit breached a fiduciary duty to him through how and why he was terminated contrary to the Whistleblower Provision contained in the Handbook and SEC filing. Under Georgia law, unenforceable language in an employee handbook cannot transform an at-will employment relationship into a fiduciary one. Fiduciary, or "confidential," relationships are characterized by mutual confidence or dependence. O.C.G.A. § 23-2-58. The relationship between employers and employees is generally arm's-length rather than fiduciary. Servicemaster Co. v. Martin, 556 S.E.2d 517, 524 (Ga. App. 2001) ("Generally, the relationship between an employer and employee is that of arms length bargaining, and the law will not imply confidentiality."); Gale v. Hayes Microcomputer Prods., Inc., 383 S.E.2d 590, 592 (Ga. App. 1989) (noting that the employer-employee relationship was "not one contemplated by O.C.G.A. § 23-2-58.").

Similarly, under South Dakota law, Poulos has no claim for breach of fiduciary duty.

-22-

"South Dakota law reflects the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act primarily for another's benefit." Nelson, 507 N.W.2d at 698. In Nelson, the Supreme Court of South Dakota further explained this concept:

> one party cannot transform a business relationship into one which is fiduciary in nature merely by placing trust and confidence in the other party. There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance which he would ordinarily exercise for his own protection.

Id. Poulos' employment was of the character of a typical arm's-length business relationship.

There is one Georgia case holding that an employer has fiduciary duties to an employee when special circumstances exist. In Cochran v. Murrah, 219 S.E.2d 421 (Ga. 1975), the employee was a barely literate farm laborer who lived in a house provided by his employer. When the farm laborer was injured on the job, the employer presented a release that it stated would provide disability and medical payments as long as the farm laborer could not work. Id. at 422. The farm laborer signed the release without reading it based on his employer's description. In reality, the release capped the employer's and the insurance company's liability to plaintiff at $1,248.74. Id. Based on these facts, a jury issue existed on whether the employee had a confidential relationship sufficient to justify setting aside the release. Id. at 424. However, since Cochran, Georgia courts have refused to find that employers owed fiduciary duties to employees in the absence of special circumstances showing dependence beyond that of an ordinary employer-employee relationship. See e.g., Servicemaster, 556 S.E.2d at 524 (despite intentional breach of employment contract by employer, no evidence of fiduciary relationship); Gale, 383 S.E.2d at 592 (despite existence

-23-

of employment handbook, court found no facts sufficient to create special relationship).

Poulos has not demonstrated any circumstances distinguishing his employment from that of a typical general manager of a Summit hotel. Poulos points to his reliance on the Handbook and Code of Ethics language concerning the reporting of ethical violations, but this alleged reliance is devoid of any special circumstances comparable to the situation faced by the plaintiff in Cochran. Therefore, no fiduciary duty existed as a matter of Georgia or South Dakota law. Consequently, Summit's motion for summary judgment is granted on Count III.

## 3. Count IV: Deceit (Fraud) Against All Defendants

Poulos makes a fraud claim in Count IV, asserting that the Whistleblower Provision in the Handbook and SEC filing constituted a promise by Summit made without any intention of performing. In Georgia, "[t]he five essential elements required to prove fraud are: a false representation made by the defendant, scienter, an intention to induce the plaintiff to act or refrain from acting in reliance upon the defendant's representation, justifiable reliance by the plaintiff, and damage to the plaintiff as a proximate result of the representation." Miles Rich Chrysler-Plymouth v. Mass, 411 S.E.2d 901, 905 (Ga. Ct. App. 1991); see also City Dodge, Inc. v. Gardner, 208 S.E.2d 794, 797 (Ga. 1974) (same).

Under Georgia law, an at-will employment relationship does not give rise to any binding promise and thus its termination does not give rise to a fraud or deceit claim. Balmer v. Elan Corp., 599 S.E.2d 158, 162 (Ga. 2004) (noting that "[a]ny promises upon which appellants may rely to show misrepresentation are unenforceable because their underlying employment contract, being terminable at will, was unenforceable.") (internal citations

-24-

omitted); see also Jacobs v. Georgia-Pacific Corp., 323 S.E.2d 238, 239 (Ga. Ct. App. 1984) (employer's alleged misrepresentations "do not afford the appellant a remedy in fraud, because the underlying employment contract, being terminable at will, is unenforceable."). Because Poulos was an at-will employee and the Handbook language alleged to be a misrepresentation was not an enforceable promise, Poulos does not have a remedy in fraud under Georgia law for Defendants not abiding by the Whistleblower Provision.

The record also lacks evidence concerning the Defendants' intent when the Handbook was created or given to Poulos. Without such evidence, Poulos cannot show that Defendants had no intent to honor the alleged promise when it was made. See Henry v. Blankenship, 621 S.E.2d 601, 605 (Ga. Ct. App. 2005) (summary judgment on fraud claim was proper in absence of evidence that defendant had no intent to perform promise to do act in future); see also Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶ 47, 714 N.W.2d 884, 897 (same).

The fraud claim also fails under South Dakota law. Under SDCL 20-10-1, "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." A deceit within the meaning of SDCL 20-10-1 is defined as either:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
> (4) A promise made without any intention of performing.

SDCL 20-10-2; Chem-Age Indus. v. Glover, 2002 SD 122, ¶ 12, 652 N.W.2d 756, 764; see

also SDCL 53-4-5 (substantially similar provisions, involving "[a]ctual fraud in relation to contracts").

Under South Dakota law, Poulos' fraud claim would turn on whether the language in the Whistleblower Provision in the Handbook and SEC filing constituted by Summit "a promise made without any intention of performing" under SDCL 20-10-2(4) or 53-4-5(4). See Weitzel, 2006 SD 45, ¶ 14, 714 N.W.2d at 891 (affirming summary judgment for defendant on fraud claim arising out of plaintiff's termination when plaintiff failed "to substantiate his allegations with sufficient probative evidence to show that [defendant] made the promise of performance without the intention to perform."). The Handbook establishes that the language relied on by Poulos does not constitute a promise, and he would not be justified in relying upon it. Even if the Whistleblower Provision had constituted a promise, Poulos failed to allege with particularity - as required by Rule 9(b) of the Federal Rules of Civil Procedure - specific facts supporting his conclusory allegation that Summit had no intention of performing such a promise. As a result, Count IV fails under both Georgia and South Dakota law.

## 4. Count V: Civil Conspiracy Against All Defendants

Poulos in Count V claims that Defendants conspired to terminate him unlawfully. A civil conspiracy claim under both Georgia and South Dakota law requires establishment of an underlying tort. J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell, 644 S.E.2d 440, 448 (Ga. Ct. App. 2007) ("Absent the underlying tort, there can be no liability for civil conspiracy.") (quoting Mustageem-Graydon v. SunTrust Bank, 573 S.E.2d 455, 461 (2002)); Kirlin v. Halverson, 2008 SD 107, ¶ 59, 758 N.W.2d 436, 455 ("Civil conspiracy "is not an

independent cause of action, but is sustainable only after an underlying tort claim has been established.") (internal citations omitted). If all of Poulos' other tort claims fail, then his civil conspiracy claim also fails. Because this Court grants summary judgment for Defendants on all of Poulos' tort claims, it must also grant summary judgment to the Defendants on the civil conspiracy claim.

## IV. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 60) is granted with respect to Count II, Count III, Count IV, Count V, and Count VI. It is further

ORDERED that Defendants' Motion for Summary Judgment (Doc. 60) is denied with respect to Count I.

Dated this *10th* day of September, 2010.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE